52 CCPA

**Application of Laurance F. VAN MATER and Kenneth E. Campbell.**

**Patent Appeal No. 7256.**

United States Court of Customs and Patent Appeals.

Feb. 11, 1965.

Rehearing Denied April 8, 1965.

Rowland V. Patrick, Boston, Mass., for appellants.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the divided decision of the Patent Office Board of Appeals affirming the rejection of claims 27 and 39 in application serial No. 622,169, filed November 14, 1956, for "Manufacture of Metal Band Saws and the Like Including Blanks and Alloys Therefor." No claims stand allowed, but the examiner's rejection of method claim 40 was reversed by the board.

The invention relates to a bandsaw or hacksaw blade and to the method of making same, herein referred to simply as the "saw." The saw has two principal zones or regions, a cutting edge composed of high-speed tool steel and a backing zone composed of a steel of the same composition as high-speed tool steel except for substantially lesser amounts of carbon. This differential composition of the cutting edge and of the backing zone allows the attainment of a fully hardened cutting edge and a tough, unhardened backing zone even though a uniform heat treatment and quenching of the whole saw blade strip is carried out because the carbon content of the backing zone is sufficiently less than that of the cutting edge so as not to be hardened to a state of brittleness.

Appellants obtain the differential composition of the strip from which their saw is to be made by starting with a steel strip having a homogeneous composition identical to high-speed tool steel except for having a lesser amount of carbon. They then transform only the cutting edge of the strip into high-speed tool steel by selective carburization. The teeth are cut and the entire strip is finally heat treated and quenched, thereby obtaining a differential hardness between the two zones.

Claim 27 reads as follows:

"27. A metal band saw, hack saw or the like comprising an integral strip structure of low-carbon carburizing grade high speed tool steel of calculated reduced carbon content in the melt as contrasted with standard high-speed tool steels including a cutting-edge working zone of full hardness of the order 64 to 66 Rockwell C and a backing zone of less than file hardness and as represented by an average hardness value of about 45 Rockwell C, wherein the working zone is defined by a preferentially carburized longitudinal edge portion of the strip and with the carbon contents of said zones so mutually correlated and controlled as to initial content in the melt and as to carburizing solely of the working zone that said final hardnesses are had in a single one-temperature high heat treating operation common to the entirety of the structure, and wherein the less-hard backing zone contains the roots and gullet bottoms of the saw teeth."

The references relied upon by the examiner are:

| | | |
|---|---|---|
| Neill | 907,167 | Dec. 22, 1908 |
| Strauss | 1,537,381 | May 12, 1925 |

Tool Steels, pages 494 to 501, edited by Gill. Published in 1944 by the American Society for Metals.

The sole issue before us is the propriety of a rejection predicated on 35 U.S.C. § 103, the examiner and board having found the appealed claims to be unpatentable over Neill in view of Strauss and Gill.

Neill discloses a method of producing saws with a high carbon cutting edge and a low carbon backing which can be heat

treated in one operation to obtain a saw blade of greater durability and reliability. He obtains the desired difference in carbon content between cutting edge and backing by casting an ingot of two steels, one of which is cast upon the other, the two steels being integrally welded together and remaining so throughout subsequent operations. The material is rolled to gauge and the strip is slit to obtain the blade. The teeth are cut along one edge and the blade is then heat treated in a single operation to obtain a saw blade having a hardened working edge with a tough and durable backing. The patentee says:

By the use of this process a much higher carbon steel may be provided for the edge of the saw than could safely be used where the steel is of the same carbon content throughout * * *.

Strauss discloses a method for producing a cutting or milling tool broadly by selecting a material of low carbon content and then "cementing" (hereinafter called carburizing since it is admitted by appellants that the two terms mean the same in this art) the cutting edge and finally uniformly heating and quenching the steel to obtain a hardened cutting edge and a backing which is tough and ductile. This reference is the United States counterpart of an application filed in Germany on March 28, 1919, and portions of the translated version are somewhat ambiguous. Since an understanding of this reference is essential to deciding the issue presented, the pertinent portion thereof is set out below:

"The method consists in making the said tools of an alloy of iron— not capable of being hardened per se —comprising from 0.1 to 0.2% of carbon and 8 to 14% of chromium, then cementing them at the cutting edge in the customary manner, and finally subjecting the tools so made to the usual tempering process by first heating and then quenching them.

"(It has been found expedient to add nickel to the alloy in a proportion of from 0.2 to 2%).

"In the case of tools manufactured in accordance with the above-described method, it is only the cemented cutting edge which becomes glass-hardened whereas the adjoining layers of the steel obtain a gradually decreasing degree of hardness and great toughness, with the result that the cutting edge will be rendered specially capable of taking up the shocks created when working, without breaking off or snapping. This advantage will particularly also then be achieved on the entire tool being uniformly heated and then quenched as an entirety. The improved method is therefore specially suitable for such kinds of tools which, as, for example, milling cutters and face and side cutters, can only be hardened by being uniformly heated and thereupon quenched as entirety. For, in this case, tools of this type if made of common tool steel or of high speed tool steel, would not only become glass-hardened at the cutting edges but in an objectionable manner all over."

The Gill publication (textbook) discloses, in a section entitled "Effect of Alloying Elements in High Speed Steel," that a lowering of carbon content produces a tool steel which is more ductile and tough than steels of higher carbon content. Gill discloses that high speed steel can be carburized and that such carburized part is of higher hardness upon quenching than the uncarburized part, which is relatively soft.

The position of the examiner, affirmed by the board, was that the secondary references show that cutting tools *in general* are made of high-speed tool steel when a durable cutting edge is desired and, that being true, the selection of high-speed tool steel *for the cutting edge* of the Neill saw, i. e., a saw having a hardened working edge and a tough and durable backing, would be an obvious application of

the known hardening properties of this steel. The board also said:

"We further share the view of the Examiner that one wishing to make the Neill sawteeth of modern high speed tool steel *would be directed* by the Strauss patent to fabricate the saw first of a homogeneous material of a composition equal to the composition of the ultimate cutting edge, high speed tool steel, less sufficient carbon so as to make the steel not hardenable to the degree that it would become brittle on an overall hardening treatment and to thereafter raise the carbon content of the cutting surfaces only by selective carburizing." [Our emphasis.]

In regard to the last paragraph of the Strauss disclosure quoted above, the board said:

"We do not consider the Strauss process to be applicable only to the particular tool steel alloys specified in the patent but is a procedure generally applicable to any steel in which the hardenability is a function of the carbon content and is capable of selective carburization. These characteristics of high speed tool steel are well known as is evident by the Gill publication.

"The fact that Strauss describes * * * an overall hardening characteristic of tools made wholly of high speed tool steels that are uniformly heated and quenched does not indicate to us any inapplicability of his disclosed process either to other tool steels than the one disclosed or to high speed tool steels in particular. Instead we gather that these undesired hardening characteristics would be found not because of the steel used but because the tool is made entirely of the same highly hardenable material and because uniform hardening of the whole tool is practiced."

According to appellants, their main quarrel with the decision of the majority of the board was the conclusion that one would be directed by Strauss to carburize only the tooth edge portion of a high-speed tool steel having an initially deficient carbon content and which was prepared from a homogeneous material. It is appellants' view that—

"* * * Strauss directs one to use his cementing only in tools made with a material *which is not hardenable per se* in order to accomplish a result that cannot be accomplished with hardenable high speed tool steel."

We do not understand the Strauss disclosure to be so restricted. The patent says that the improved method is *especially suitable* for cutting tools which "can only be hardened by being uniformly heated and thereupon quenched as [an] entirety." Immediately following this passage, Strauss says, "For, in this case, tools of this type if made of common tool steel or of high speed tool steel, would not only become glass-hardened at the cutting edges but in an objectionable manner all over." We construe this to mean simply that, *prior to Strauss's invention,* cutting tools made of high-speed tool steel would become glass-hardened all over if uniformly heated and quenched as an entirety, but that now, by virtue of the Strauss invention, the very desirable feature of uniform heating and quenching as an entirety in the manufacture of such cutting tools could be employed *without* resulting in a tool which is glass-hardened all over. This would be accomplished, according to Strauss, by starting with a material of low carbon content, carburizing a portion thereof, and heating and quenching the entire material.

We therefore agree with the board that the Strauss process is not limited to the particular tool steel alloys specified in the patent (see first two paragraphs of Strauss disclosure quoted above), but "is a procedure generally applicable to any steel in which the hardenability is a function of the carbon content and is capable of selective carburization." It is axiomatic, we believe, that a patent is a good reference not only for

what it discloses by way of direct anticipation but also for what it suggests to a person of ordinary skill in the art. Application of Lundberg et al., 197 F.2d 336, 39 CCPA 971.

■ In summary, it is our view that, notwithstanding the fact that the particular materials used by Strauss might "be recognized as not having either the necessary fatigue resistance or red hardness for saw use," as appellants contend, it does not follow that Strauss leads away from the invention here on appeal. To the contrary, the Strauss disclosure as a whole is believed to direct one of ordinary skill in this art toward the manufacture of bandsaws having a tooth edge portion carburized to a high-speed tool steel carbon content and a backing zone homogeneous therewith in alloy content other than carbon.

In regard to the Gill publication, appellants call attention to the following passage which, they contend, was not given adequate consideration by the examiner and the board:

> "Carburization is never recommended for cutting tools such as drills, reamers and taps for the increased carbon content will include brittleness in the edges of these tools and result in early failure."

Our response to this contention is twofold. First, the passage is taken out of context, as indicated by noting even the next preceding sentence which says that *"Carburization* of high speed steel * * may be advantageous where the resistance to abrasion is of great importance, as encountered in such tools as wearing plates and certain classes of blanking dies." The Gill publication is really directed to, and was used by the examiner for a disclosure of the *properties* of alloys and the effect thereon of varying the content of certain elements, such as carbon; it is not directed to the *application* of these alloys to particular tools. However, insofar as certain cutting tools are mentioned, we believe one interested in producing bandsaws would not be directed away from the concept of carburizing a homogeneous strip low in carbon because Gill tells him that certain outstanding properties, which this person would be seeking, could be obtained thereby. Secondly, as aptly stated by the solicitor, the warnings mentioned in the above-quoted excerpt from Gill would serve to reinforce the Strauss suggestion that the alloy selected should have a reduced amount of carbon initially and that only the required amount of carbon be added in the portions *where needed.* Obviously, the entire tool cannot be free of a high carbon content. In short, the noted statements by Gill advising against using the usual high carbon tool steel alloy in certain types of tools could well lead toward, rather than away from, the use of a modified low carbon alloy in bandsaws.

For the reasons set forth above, the decision of the board is affirmed.

Affirmed.