**Application of Jules MERCIER.**

**Patent Appeal No. 74–528.**

United States Court of Customs
and Patent Appeals,

May 15, 1975.

---

**1162**

---

Keith V. Rockey, Chicago, Ill., attorney of record, for appellant. David R. Murphy, Arlington, Va., of counsel.

Joseph F. Nakamura, Jack E. Armore, Associate Sol., Washington, D. C., for Commissioner of Patents.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Appeals affirming the examiner's rejection of all claims remaining in application serial No. 708,775, filed February 28, 1968, entitled "Process for Splitting Acetals and Hemi-Acetals." We reverse.

### The Invention

Appellant's invention relates to a process for "splitting" acetals and hemi-ace-

tals by either hydrolysis or alcoholysis reactions. The alcoholysis of acetals or hemi-acetals by means of alcohols results in the formation of acetals having alcohol radicals different from those on the original material. The hydrolysis reaction of acetals or hemi-acetals with water results in the formation of the corresponding aldehydes.

Appellant's specification describes the reactions of the invention as follows:

> These reactions can be illustrated by the following equations in which R, R′ and R″ can be organic radicals which are the same or different hydrocarbon radicals which may be straight or branched-chain alkyl radicals having from 1 to 12 carbon atoms, such as methyl, ethyl, propyl, isopropyl, butyl, isobutyl, amyl, isoamyl, hexyl, 2-ethyl butyl, heptyl, octyl, isooctyl, 2-ethyl hexyl, nonyl, isononyl, decyl and dodecyl; alkenyl radicals having from 3 to 12 atoms, such as propenyl, butenyl, hexenyl and allyl, the olefinic linkage of the alkenyl radicals being not in $\alpha$, $\beta$; alicyclic radicals, such as cyclohexyl and methyl cyclohexyl; and aralkyl radicals, such as benzyl. R can also be hydrogen or an aromatic radical, such as phenyl, tolyl and xylyl, the aromatic radical having only one nucleus, the nucleus bearing no more than two alkyl substitutents, and the total amount of carbon atoms of the alkyl substituents, if any, being from 1 to 5.
>
> Hydrolysis:
>
> $$R-CH(OR')_2 + H_2O \longrightarrow R-CHO + 2\ R'OH$$
>
> Alcoholysis:
>
> $$R-CH(OR')_2 + 2\ R''OH \longrightarrow R-CH(OR'')_2 + 2\ R'OH$$

The prior art processes for accomplishing the above-referred to reactions are apparently subject to some difficulties. For example, the removal of one or both of the OR′ groups on the acetal may have a tendency to cause polymerization into what the specification refers to as "complex compounds of varying and not accurately defined polymerization degree." The removal of an OR′ group apparently can also lead to the formation of undesired highly volatile and explosive ethers. Additionally, use in many of the prior art processes of a strong inorganic acid such as sulfuric acid to catalyze the splitting reaction causes corrosion problems and provides a product which is difficult to separate from the catalyst.

Appellant's process for "splitting" acetals and hemi-acetals is accomplished by passing a homogeneous liquid phase containing the reactant upwardly through a bed of suspended catalyst particles in the form of a sulfonic ion-exchange resin in the acid form.

The specification sets forth the processing details by which the process may be carried out as follows:

> Continuous operation may, for example, be performed by passing the liquid reactants heated to reaction temperature through a reaction zone containing a catalyst and maintained under the pressure required for maintaining the reaction medium or mixture in a liquid state at the operating temperature. One may advantageously employ, inter alia, an inverted cone-shaped reactor through which the reaction medium or mixture flows in an upward direction *thereby to maintain the finely divided catalyst in a dispersed or suspended state or in a fluidized state through the liquid phase.* [Emphasis added.]

The language of the claims defines the invention in much the same manner as the specification, except that the sulfonic ion exchange catalyst is referred to as a "fluidized catalyst" instead of a catalyst in a "dispersed or suspended state or in a fluidized state through the liquid phase." Claim 16 is representative:

> 16. A process for splitting acetals and hemi-acetals which comprises passing a homogeneous liquid reaction mixture comprising a compound selected from the group consisting of an acetal having the formula:
>
> $$R-CH(OR')_2$$

and a hemiacetal having the formula:

$$R-CH(OH) (OR')$$

wherein R is selected from the group consisting of hydrogen and a hydrocarbon group containing 1–12 carbon atoms and R′ is a hydrocarbon group containing 1–12 carbon atoms and a material selected from the group consisting of water and a mixture of alkanol and water, wherein the water constitutes between 5–30% by weight of the reaction mixture, upwardly through a fluidized catalyst, said catalyst being a sulfonic ion exchange resin in acid form, at a temperature of 60° to 140° C. and a pressure sufficient to maintain the reaction mixture in the liquid phase.

### The Prior Art Rejection

The following references were relied on:

| | | |
|---|---|---|
| Enk et al. (Enk) | 3,317,593 | May 2, 1967 |
| Alheritiere et al. (Alheritiere) | 2,980,731 | April 18, 1961 |

The board cited the following as "[g]eneral references of which we take judicial notice":

Webster's Third New International Dictionary, Unabridged, p. 877 (1963).

Kirk-Othmer, Encyclopedia of Chemical Technology, Second Edition, Vol. 9, pp. 398, 399 (1966).

The Condensed Chemical Dictionary, 7th Ed., p. 423 (1966).

Hackh's Chemical Dictionary, 4th Ed., p. 273 (1969).

Perry's Chemical Engineers' Handbook, 4th Ed., § 20, pp. 42–52, particularly, p. 50 (1963).

The appealed claims were rejected by the examiner over Enk in view of Alheritiere under the provisions of 35 U.S.C. § 103. Enk teaches a process for the hydrolysis of alkanol derivatives, such as acetals, by means of water in the presence of a static acid exchange catalyst. His specification states:

It is known to crack hydrolyzable organic oxygen compounds such as, for example, esters, acetals or ketals, in the presence of acid catalysts, like mineral acids or cation exchangers, with water, into alcohol and the appropriate organic residue. In all cases the reaction can be carried out only up to the hydrolysis equilibrium. The hydrolysate in equilibrium, consisting of the starting substance, water, alcohol and a second cracking product which, depending upon the starting substance, is an acid, an aldehyde or a ketone, is then separated into its components.

Alheritiere discloses a process in which a solid catalyst is suspended in an upwardly flowing liquid reaction mixture. The catalyst is thus suspended in a turbulent state in the liquid permitting more efficient mass and heat transfer rates and facilitating reactions involving heterogeneous liquid mixtures. Alheritiere teaches generally that hydrolysis reactions using an ion exchange resin catalyst may be advantageously accomplished by means of his process, but he nowhere specifically discloses the hydrolysis of either acetals or hemi-acetals.

The board agreed with appellant that it was improper for the examiner to combine the two references, "with respect to the inventive contribution of Enk et al.," but upheld the rejection insofar as it was based on "the teachings of Enk et al. as to what was previously known in the art." The board stated:

In view of the teachings in Enk et al. as to the relationship between esters and acetals in hydrolysis by means of cation exchange resins it would clearly be obvious to one skilled in this art to substitute an acetal for the methyl acetate or other esters in Alheritiere et al., thus to anticipate appellant's claimed contribution. The Examiner's rejection will therefore be sustained.

### Other Rejections

The appealed claims were further rejected by the examiner as failing to comply with the second paragraph of 35 U.S.C. § 112, "as being indefinite in the recitation 'a fluidized catalyst' in claim 16, on which all the other claims depend

directly or indirectly." The examiner stated:

> In a true fluidized system, a gas is passed upwards through a mass of granular or powdered solid, so that particles are "floated" and the mass resembles a boiling liquid in appearance. See In re Edwards [43 CCPA 884, 232 F.2d 641, 109 USPQ 380 (1956)], 1956 C.D. 264. The term "fluidized" is not appropriate to a system wherein the solids are suspended in a liquid medium.

Sustaining the rejection, the board commented:

> The teaching in page 3 of the specification of the catalyst in a dispersed suspended or fluidized state throughout the liquid phase is not the above-cited terminology now incorporated in the claims by an amendment. While the dictionary cited by appellant appears to include a moving liquid to suspend solids to produce a fluidized catalyst it might appear that such a liquid in boiling condition may be intended since the more general definition of a fluidized catalyst is limited to finely divided solid catalysts suspended in a moving gas in such manner that the entire mass acts like a fluid. Webster's and Hackh's Dictionaries, above-cited, as well as Kirk-Othmer's Encyclopedia and Perry's Handbook demonstrate the widespread acceptance of a gas or vapor as the suspending agent. Further as the Examiner has indicated in the decision cited by appellant, In re Edwards, 1956 C.D. 264, the references therein discussed also indicate the term "fluidized catalyst" to be known as applied to gas-suspended solid catalyst particles.

Furthermore, since the term "fluidized catalyst" was added to the claims by amendment, the board sustained the rejection of the claims as lacking antecedent basis in the specification and thus introducing new matter prohibited by 35 U.S.C. § 132 and Rule 75(d), 37 CFR 1.75(d).

The board went on to find an additional basis for the examiner's rejection of the claims based on the first paragraph of section 112:

> [S]ince it is quite apparent that the criticized term encompasses gas suspension of the catalyst which would not appear to be operative in the claimed process, the terminology not only violates 35 U.S.C. 112, second paragraph, in delineating more than that which appellant considers to be his invention but also fails to find enabling support in the disclosure (paragraph one of this section of the statute). The Examiner's rejection will therefore be sustained.

## OPINION

### The Prior Art Rejection

■ Whether appellant's invention is obvious under 35 U.S.C. § 103 depends at the outset upon the propriety of the board's simultaneous reliance on what Enk says is known in the art and disregard of the rest of Enk's disclosures. We find several difficulties with this analysis. The general statement in Enk that one having ordinary skill in this art is aware that acetals may be cracked with water in the presence of an acid catalyst, "like mineral acids or cation exchangers," lacks any teaching of how the process is accomplished by prior art techniques. What temperatures would be required for the reaction? What was the physical state of the catalyst? Will the reaction proceed in a homogeneous liquid phase, or in a gaseous phase or only in a multi-phase system? These and other questions arise because the board's approach fails to recognize that *all* of the relevant teachings of the cited references must be considered in determining what they fairly teach to one having ordinary skill in the art. In re Meinhardt, 392 F.2d 273, 276, 55 CCPA 1000, 1004 (1968). See also In re Halley, 296 F.2d 774, 49 CCPA 793 (1961); In re Van Mater, 341 F.2d 117, 52 CCPA 1076 (1965).

The relevant portions of a reference include not only those teachings which would suggest particular aspects of an invention to one having ordinary skill in the art, but also those teachings which would lead such a person away from the claimed invention. See In re Lunsford, 357 F.2d 380, 53 CCPA 986 (1966).

The board's approach amounts, in substance, to nothing more than a hindsight "reconstruction" of the claimed invention by relying on isolated teachings of the prior art without considering the over-all context within which those teachings are presented. Without the benefit of appellant's disclosure, a person having ordinary skill in the art would not know what portions of the disclosure of the reference to consider and what portions to disregard as irrelevant, or misleading. See In re Wesslau, 353 F.2d 238, 53 CCPA 746 (1965).

Enk's specification was relied upon by the board to show that organic hydrolyzable oxygen-containing compounds, including esters and acetals, may be cracked "in the presence of acid catalysts, like mineral acids or cation exchangers with water into alcohol and the appropriate organic residue." This disclosure is relevant to the obviousness inquiry, since appellant claims, *inter alia*, a process for the hydrolysis of acetals and hemi-acetals in the presence of water and a sulfonic ion-exchange resin catalyst in the acid form. There is, however, additional relevant knowledge made available by the disclosure of Enk within the context of which the isolated teaching ought properly to be considered.

Again referring to the prior art, Enk teaches:

In all cases the reaction can be carried out only up to the hydrolysis equilibrium. The hydrolysate in equilibrium, consisting of the starting substance, water, alcohol and a second cracking product which, depending upon the starting substance, is an acid, an aldehyde or a ketone, is then separated into its components.

Since due to the *unfavorable hydrolysis equilibrium,* which for instance under stoichiometric conditions for methyl acetate means only about 30% conversion—a comparatively large quantity of methyl acetate is present in the hydrolysate which with methanol form an azeotropic mixture in the proportion of about 4:1, the larger part of the methanol can be obtained only in the form of the azeotropic mixture from which it must be separated for instance by extractive distillation * * *. [Emphasis added.]

Enk discloses a process for avoiding this deleterious equilibrium condition which by:

removing both reaction products and retaining the starting substance (the hydrolyte) in the reaction chamber, permits the shift of the equilibrium in the direction of complete hydrolysis and thus make possible an almost 100% transformation without circulation of the starting substrate and without forming an azeotropic mixture, with a single pass. The process is characterized by the fact that the water-containing liquid phase flowing downward in the ion exchanger bed and perhaps containing the second cracking product is used for the extraction of the obtained alkanol, and the starting substance is kept in the rising vapor phase until the transformation is complete.

Enk thus warns that the equilibrium condition for the reaction is to be avoided, and that this may be accomplished by carrying out the hydrolysis reaction in a heterogeneous phase system in order to continuously remove the reaction products while maintaining the starting material in the vapor phase in the reaction vessel. The patent states:

The ion exchanger column 1 is kept, by external heating and, if desired, by adding the reaction partners in vapor form, at a temperature sufficient to hold part of the reaction mixture, i. e. particularly the starting substance, in vapor form, without any significant

recirculation existing in the reflux condenser 3.

■ Because the only other reference before the board, Alheritiere, discloses only esters and makes no mention of acetals and hemi-acetals, Enk must be relied upon to show that acetals and hemi-acetals are, *in the context of the claimed invention, equivalent* to esters. Without such a showing, Alheritiere is irrelevant to the claims at issue, which are confined solely to acetals and hemi-acetals.

■ In answer to the solicitor's contention that the difference in the reactivity of esters and acetals is a new argument not properly before this court, we direct the solicitor's attention to appellant's reply brief, filed December 7, 1972, where he argued:

> The Examiner takes the position [that Enk] equates the hydrolysis of esters and hydrolysis of acetals. However, the distinction between these materials which the Examiner overlooks is the fact that acetals are subject to deleterious side reactions such as ether formation and polymerization whereas esters are not.

This is a sufficient basis in the record presented to the board to merit our consideration of this issue in the present appeal.

■■ Our review of Enk's teachings convinces us that they fail to teach the equivalency between acetals and esters for the purposes of the present invention. A mere known *relationship* between acetals and esters as disclosed by the isolated portion of Enk upon which the board relied is insufficient to support the rejection. As distinguished from a disclosure of *equivalents*, the disclosure of a *known relationship* does nothing more than teach that it would have been *obvious to try*, which is insufficient under section 103. In re Lindell, 385 F.2d 453, 55 CCPA 707 (1967). Many compounds have a known relationship but are not equivalents for substitution in different reactions. A mere *relationship* is an insufficient basis for the necessary

predictablility of success to sustain a rejection under section 103. See In re Naylor, 369 F.2d 765, 54 CCPA 902 (1966).

Appellant argues that significant aspects of the claimed invention are dissimilar to Alheritiere's reaction because there are no side reactions possible for the ester, whereas side reactions are often a problem in acetal and hemi-acetal hydrolysis and are disclosed in appellant's specification. Hydrolysis of esters results in the formation of a carboxylic acid and an alcohol. The acetal hydrolysis reaction, as noted above, results in the formation of an *aldehyde* and an alcohol. Consistent with appellant's position, we note that aldehydes are generally recognized to be inherently reactive compounds in the presence of the acidic catalysts required for the hydrolysis and form polymerization products because the carbonyl bond in the aldehyde is subject to attack by hydrogen ions present in the solution. Carboxylic acids are, by contrast, generally stable in acidic solutions and will not normally engage in side reactions of the type noted for the aldehydes. Accordingly, Enk's statement cannot be given the broad sweep required to sustain the rejection and may in fact be disbelieved for the purposes of specific liquid phase acid catalyzed hydrolysis reactions.

Considering the alleged teaching of equivalency in the context of *all* the relevant teachings of the references, we conclude that it must fail insofar as the process of Alheritiere is concerned, because the reference that is relied upon for the teaching is presented in the context of a prior art process that is significantly dissimilar to that of the claimed invention.

Given that Enk's "inventive contribution" cannot be ignored, the board has in substance agreed with this conclusion by finding that it was improper for the examiner to combine the two references "with respect to the inventive contribution of Enk et al."

■ The conclusion that appellant's invention would have been nonobvious to

one having ordinary skill in the art on the basis of the cited art is further buttressed by the fact that the claimed invention is a catalytic process. The unpredictability of catalytic phenomena has long been recognized by this court. As previously noted, Enk's disclosure is relied upon by the board for the proposition that organic oxygen-containing compounds, including acetals, may be hydrolyzed using the catalyst of appellant's invention. This does not render the process of appellant's invention any less unpredictable, because a successfully catalyzed process depends not only on the particular catalyst that may be employed but also on the environment within which the catalysis is accomplished.

The fact that the processing details of the claimed invention are substantially identical to those set forth in Alheritiere lends nothing to the rejection unless it can be shown that it would have been obvious to substitute acetals or hemi-acetals as reactants for the esters of Alheritiere. The adequacy of any such showing of equivalency must be scrutinized especially carefully, as we have attempted to do, where it is alleged to have been obvious to substitute one starting material for another in a *catalytic* process. The disclosure of Enk, relied upon by the board, is simply not sufficient for this purpose, especially in view of the over-all dissimilarity of the process of Enk to that of Alheritiere.

### Other Rejections

We will follow the board's format and consider simultaneously the indefiniteness rejection based on the second paragraph of section 112, the alleged lack of antecedent basis for the claims in the specification required by Rule 75(d), 37 CFR 1.75(d), and the new matter rejection based on section 132, as well as an additional basis for the rejection found by the board based on the first paragraph of section 112. All of these rejections relate to appellant's use of the phrase "a fluidized catalyst" in claim 16, and each requires consideration of the same relevant portions of the specification.

The relevant portion of the second paragraph of section 112 has been construed to require only that the claims "set out and circumscribe a particular area with a reasonable degree of precision and particularity." In re Moore, 439 F.2d 1232, 1235, 58 CCPA 1042, 1046 (1971); In re Miller, 441 F.2d 689, 692, 58 CCPA 1182, 1186 (1971). As this court has reiterated on several occasions, "[i]n the absence of evidence to the contrary, we will assume * * * that what the claims define is what the applicant *regards* as his invention." (Emphasis added.) In re Miller, supra; In re Moore, supra.

Applying this analysis, if one can determine whether a particular catalytic process for splitting acetals and hemiacetals is or is not within the scope of a claim, the claim fulfills its purpose as a definition. See In re Miller, supra. Referring to the term in claim 16 which has been objected to, namely "fluidized," we note that appellant does not simply provide that the reaction mixture is passed "upwardly through a fluidized catalyst," but he goes on to limit in some detail the physical and chemical characteristics of the catalyst and reaction mixture by concluding "said catalyst being a sulfonic ion exchange resin in acid form, at a temperature of 60° to 140° C. and a pressure sufficient to maintain the reaction mixture *in the liquid phase*." (Emphasis added.)

Assuming, *arguendo* that the phrase "fluidized catalyst" is more often than not used to refer to a gas-suspended catalyst system, it does not follow that confusion will result when the phrase is used in a claim to refer to a finely divided catalyst in a dispersed or suspended state in a liquid phase. Whether a term used in a claim is conventional is not necessarily controlling on the question of indefiniteness. See In re Castaing, 429 F.2d 461, 57 CCPA 1332 (1970).

Since we are unable to see why or how there would be uncertainty over the plain meaning of the claim read *in its entirety* in view of the quoted portion

which provides that the reaction mixture is in a liquid phase, the section 112 second paragraph rejection must be reversed.

■ Referring to the requirements of the first paragraph of section 112, the board found that the phrase "fluidized catalyst" "encompasses gas suspension of the catalyst which would not appear to be operative in the claimed process" and so "fails to find enabling support in the disclosure." The board also found that, since the criticized phrase first appeared in nonoriginal claim 15, it represents new matter introduced into the disclosure of the invention which is prohibited by the last sentence in 35 U.S.C. § 132, and there is no original antecedent basis therefor in the specification as required by Rule 75(d).

We have already determined that the relevant portions of appellant's claims call for a "homogeneous liquid reaction mixture" which is passed "upwardly through a fluidized catalyst." Because the claims require the catalyst to be suspended by an upwardly flowing liquid reaction mixture, gas suspensions of the catalyst are clearly not within the scope of the claims.

We, therefore, find that appellant has fully complied with the first paragraph of section 112, and that the addition of the objected to phrase by amendment to the claims does not constitute a violation of the requirement of either the new matter prohibition of section 132 or the antecedent basis provision of Patent Office Rule 75(d).

Accordingly, the decision of the board is reversed.

Reversed.

MARKEY, Chief Judge (dissenting).

Appellant's sole contribution to the art is the proposal to use Alheritiere's process, apparatus and catalyst in the hydrolysis of acetals instead of esters. But Enk says that those skilled in the art had long known that acetals could be hydrolyzed in the presence of the same catalyst. Appellant does not deny, and nowhere attempts to disprove the *truth* of Enk's statement. Lack of explicit suggestion of the substitution is not fatal to a finding of obviousness. In re Lindell, 385 F.2d 453, 55 CCPA 707 (1967). The probative question is what Enk's disclosure means to those skilled in the art. In re Baranauckas, 395 F.2d 805, 55 CCPA 1204 (1968).

That Enk does not supply temperatures, pressures and the like is of no moment. Alheritiere supplies them.

The unpredictability of catalytic processes loses import here. Enk, Alheritiere and appellant all employ the same catalyst.

The alcohol formed in the hydrolysis of both esters and acetals is capable of side reaction. As recognized in appellant's specification, temperatures must be limited to avoid risk of such alcohol reaction.

Enk's invention is totally irrelevant. It does not in any manner refute or conflict with the statement of Enk concerning the knowledge and level of skill in the art. Nor does it suggest that acetals could not be hydrolyzed in Alheritiere's process and apparatus.

Finding no error in the board's upholding of the examiner's rejection under 35 U.S.C. § 103, I would affirm its decision.