26 F.3d 139
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
In re Iris J. DAVIS.
 No. 93-1524.
 United States Court of Appeals, Federal Circuit.
 April 26, 1994.
 
 Before NIES, PLAGER and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Iris J. Davis appeals from the decision, on reconsideration, of the United States Patent and Trademark Office Board of Patent Appeals and Interferences (Board), affirming the rejection of claims 1-4 and 8-10 of Davis' patent application, Serial No. 911,872, as unpatentable under 35 U.S.C. Sec. 103 (1988).[1] We affirm.
 
 
 2
 * The subject matter of Davis' application concerns a method of neutralizing axillary malodor--malodor present in the axillary fossae, or arm-pits--through chemical reaction with the malodor-causing compounds. Illustrative of the invention, claim 1 reads:
 
 
 3
 A method of axillary malodor neutralization comprising contacting the malodor with a malodor-reducing concentration of a sulfhydryl reactant.
 
 
 4
 In affirming the rejection of Davis' claims[2] as obvious, the Board relied on three references--86 Chemical Abstracts 358, p 86:60,568b (1977) (Yamamoto); 97 Chemical Abstracts 426, p 222,753q (1982) (Tamura); and 58 Chemical Abstracts p 9547e (1963) (Lee) (collectively, the leading references)--together with a fourth reference, Cosmetics Science & Technology 1207-11 (E. Sagarin ed., 1957) (Sagarin). Yamamoto discloses a certain maleimide effective in controlling the odor produced by ammonia, amines, and various sulphur-containing compounds present in garbage piles and stables. Tamura discloses deodorants containing maleimides that control odors produced during hair wave-setting by combining with ammonia, amines, and sulfhydryl (SH)-containing compounds (thiols or mercaptans). Lee discloses use of maleimides during bread-baking to reduce the quantity of mercaptans present. Although the three leading references thus teach that maleimides[3] may be used for controlling odors caused by ammonia, amines, and mercaptans in various settings, it is undisputed that the three leading references alone would not have rendered the present invention obvious to one of ordinary skill in the art, because none discloses either use of maleimides in the axillary environment or the substances responsible for axillary malodor. Thus, Sagarin's teachings are the key to the Board's holding.
 
 
 5
 Sagarin teaches, inter alia, that the human body produces two types of sweat: Eccrine sweat, resulting from the body's natural reaction to heat, and apocrine sweat, an adrenaline-induced excretion. The term "axillary sweat" thus refers not to a distinct type of sweat, but instead to sweat, whatever the makeup thereof, present in the axillary fossae.
 
 
 6
 In its original decision, the Board affirmed the rejection of the claims as unpatentable under 35 U.S.C. Sec. 103 (1988), holding that Sagarin "teaches that ... [mal]odorous sulfur and nitrogen containing compounds contribute to axillary malodor." In response to Davis' arguments based on the "Jass" affidavits, previously submitted to the examiner by Davis in an attempt to overcome the obviousness rejection, the Board stated:
 
 
 7
 It is important to note that the present claims are not specifically directed to a process involving the neutralization of the sulfhydryl moieties contained in malodor but are broadly directed to neutralizing "axillary malodor" generally by contacting the malodor ... with ... a maleimide.
 
 On reconsideration, the Board elaborated:
 
 8
 Sagarin teaches that genuine apocrine sweat (axillary sweat) contains a considerable amount of odor producing materials including protein derivatives. Protein derivatives obviously contain nitrogen moieties and more than likely also contain sulfur moieties. We also note that Sagarin teaches that apocrine sweat contains high concentrations of ammonia.... [Thus,] ... Sagarin fairly teaches that sulfur and/or nitrogen containing materials contribute to body malodor in axillary sweat. (citation omitted). Dissatisfied with the Board's opinion, Davis timely appealed to this court.
 
 II
 
 9
 This court reviews an obviousness determination by the Board de novo, while reviewing any factual findings underlying the obviousness determination for clear error. In re Woodruff, 919 F.2d 1575, 1577, 16 USPQ2d 1934, 1935 (Fed.Cir.1990); see Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1572-73, 24 USPQ2d 1321, 1332-33 (Fed.Cir.1992) (scope and content of prior art, and differences between prior art and claimed invention, are questions of fact).
 
 
 10
 Davis alleges several errors in the Board's determination of what Sagarin teaches to one of ordinary skill in the art. Specifically, Davis argues, inter alia, that the Board erred in finding that Sagarin teaches the presence of odor-causing amounts of sulfur moieties, specifically thiols, the odor of which would be neutralized through reaction with sulfhydryl reactants. In response, the Board presents the following argument: "protein derivatives" come from proteins; proteins include amino acids; one of the frequently occurring amino acids is cysteine; cysteine includes a sulfhydryl group; and therefore protein derivatives must include malodorous sulfhydryl-containing compounds.
 
 
 11
 This argument in support of the Board's rejection is simply too attenuated to provide a sound basis for an obviousness rejection. Nothing in Sagarin teaches that the "protein derivatives" present in apocrine sweat must include malodorous, sulfur-containing compounds. Moreover, the Board's language on reconsideration that "[p]rotein derivatives ... more than likely also contain sulfur moieties" (emphasis added) is speculative and therefore insufficient to support the rejection. In re Rijckaert, 9 F.3d 1531, 1533 n. 3, 28 USPQ2d 1955, 1957 n. 3 (Fed.Cir.1993) (Board's language that limitation was "probably satisfied" by prior art "is speculative and therefore does not establish a prima facie case of unpatentability.").
 
 
 12
 That Sagarin does not teach the presence of malodorous sulfur compounds in human sweat, however, does not dispose of this case. The Board also found that Sagarin teaches the presence of malodorous nitrogenous compounds, including ammonia, in axillary sweat.[4] Since maleimides readily combine with such compounds to reduce the odor caused thereby, as disclosed by the three leading references, such a finding, unless clearly erroneous, would provide a basis for upholding the Board's conclusion of obviousness.
 
 
 13
 Davis' only response to the Board's reading of Sagarin and its teachings concerning nitrogenous compounds and ammonia, both in his briefs and at oral argument, is that Sagarin's discussion of ammonia in apocrine sweat appears solely in the context of the acidity (pH) of sweat, and specifically does not appear in Sagarin's section discussing the malodor produced by apocrine sweat. We find Davis' argument unpersuasive.
 
 
 14
 Sagarin clearly teaches the presence of relatively high concentrations of ammonia in axillary and apocrine sweat:
 
 Apocrine Sweat: Components
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 [There is] 15 times more ammonia-nitrogen in axillary sweat than in sweat from other skin areas,.... While some of the larger amount of ammonia-nitrogen in the axillary sweat may be due to increased enzymatic ammonia production from urea, the excess is so great that it is presumably at least in part attributable to the admixture of apocrine sweat and a higher concentration of ammonia-nitrogen in the latter.
 
 
 18
 (emphasis added).
 
 
 19
 pH of Axillary Sweat and Skin Surface
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 [T]he higher pH obtained in the axillary vaults of adults distinctly exceeds the effect attributable to the action of the intertriginous site alone, and ... this surplus is caused by an additional factor, namely by the presence of apocrine sweat itself....
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 The high ammonia concentrations in "apocrine" sweat ... appear largely responsible for the shift in pH toward alkalinity.
 
 
 26
 (emphasis added).
 
 
 27
 That the contribution of ammonia to axillary malodor is not actually discussed in the "malodor" section of Sagarin cannot provide Davis with the refuge she seeks, since it is well known that ammonia has a pungent odor. To ignore this knowledge would be to "presume[ ] stupidity [of the artisan] rather than skill." In re Sovish, 769 F.2d 738, 743, 226 USPQ 771, 774 (Fed.Cir.1985). "[A]ll of the relevant teachings of the cited references must be considered in determining what they fairly teach to one having ordinary skill in the art." In re Mercier, 515 F.2d 1161, 1165, 185 USPQ 774, 778 (CCPA 1975); see also Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 448, 230 USPQ 416, 519 (Fed.Cir.1986) (quoting In re Wesslau, 353 F.2d 238, 241, 147 USPQ 391, 393 (CCPA 1965)), cert. denied, 484 U.S. 823 (1987).
 
 
 28
 Moreover, the second Jass affidavit, which Davis submitted to counter the obviousness rejection, supports a finding that Sagarin teaches to one of ordinary skill in the art that ammonia would contribute to axillary malodor. While discussing Sagarin's observation that indoxyl- and scatoxylsulfate are present in eccrine sweat, Jass states:
 
 
 29
 [I]f odor was to be associated with the cited compounds, the indoxyl and scatoxyl moieties would be regarded as being responsible, not the sulfate part. Inasmuch as both of these molecules contain nitrogen, not sulfur, a person skilled in the art would expect that nitrogen compounds, not sulfur compounds, might be a source of odor. Therefore, the cited references clearly lead away from sulfur compounds, rather than to them.
 
 
 30
 (emphasis added). Further,
 
 
 31
 [Sagarin] mention[s] the high ammonia concentrations in apocrine sweat. Ammonia is a strong odorous material which contains nitrogen, not sulfur.
 
 
 32
 (emphasis added).
 
 
 33
 In light of both Sagarin's disclosure of the presence of ammonia in axillary sweat and Davis' admissions found in the Jass affidavits, see In re Thorpe, 777 F.2d 695, 697-98, 227 USPQ 964, 966 (Fed.Cir.1985), we cannot conclude that the Board's finding as to odorous nitrogenous compounds in axillary sweat is clearly erroneous.
 
 
 34
 Because a claim is given its broadest reasonable interpretation during prosecution, In re Etter, 756 F.2d 852, 858-59, 225 USPQ 1, 5-6 (Fed.Cir.) (in banc), cert. denied, 474 U.S. 828 (1985); In re Zletz, 893 F.2d 319, 321, 13 USPQ2d 1320, 1321-22 (Fed.Cir.1989), and in light of Sagarin's suggestion that the malodorous substances produced through the decomposition from apocrine sweat may be eliminated through "chemical combination" with other reactive substances, see In re Jones, 958 F.2d 347, 351, 21 USPQ2d 1941, 1943-44 (Fed.Cir.1992) (there must be some suggestion to combine, "either in the references themselves or in the knowledge generally available to one of ordinary skill in the art"), we must sustain the Board's decision on appeal because the claims are broad enough to encompass reducing[5] the odor produced by ammonia[6] present in axillary sweat through reaction with a maleimide. We are not called upon to decide if a claim drawn more narrowly to define Davis' apparent invention would avoid an obviousness rejection on the references thus far disclosed.
 
 
 
 [1]
 In re Davis, No. 92-2614 (Sept. 25, 1992) (decision); (May 26, 1993) (reconsideration)
 
 
 [2]
 In this appeal, all claims rejected as obvious stand or fall with claim 1, the only independent claim, because each was not separately argued before the Board. In re King, 801 F.2d 1324, 1325, 231 USPQ 136, 137 (Fed.Cir.1986)
 
 
 [3]
 Even though claim 1 refers to a "sulfhydryl reactant" rather than a maleimide, the claim is broad enough to read on a maleimide because a maleimide is a "sulfhydryl reactant," a fact taught by the three leading references
 
 
 [4]
 At oral argument, Davis vigorously contended that axillary malodor results solely from the presence of apocrine sweat because eccrine sweat allegedly does not occur in human arm-pits. We note that the Board, by the language "Sagarin teaches that genuine apocrine sweat (axillary sweat) contains...." in its reconsideration decision, could be understood to have found that only apocrine sweat is present in the arm-pits
 To the extent that the Board found that only apocrine sweat is present in the arm-pits, the Board clearly erred. It is hard indeed to fathom how one can ignore that arm-pits tend to produce heat-induced sweat when warm. Moreover, Sagarin clearly teaches that eccrine sweat is found in the intertriginous areas of the human body, where sweat evaporation is impeded through the close contact of opposed skin surfaces. As Sagarin confirms, human arm-pits are just such intertriginous zones.
 Although Sagarin teaches, inter alia, the presence of "fetid sweat ... in intertriginous and other skin areas where sweat evaporation is impeded," Sagarin also teaches that "[t]he [mal]odor of axillary sweat is, nevertheless, largely caused by secondary decomposition of apocrine sweat under the influence of extraneous microbial enzymes." We need not decide whether the presence of eccrine sweat in the axillary fossae actually contributes to axillary malodor, however, because Sagarin's discussion of the makeup of apocrine sweat alone is sufficient on this record to sustain the Board's decision.
 
 
 [5]
 Claim 1 does not require complete elimination of the malodor. Instead, it only calls for reacting the malodor with a "malodor-reducing concentration of a sulfhydryl reactant."
 
 
 [6]
 That a "sulfhydryl reactant" not only reacts with mercaptans, but is also capable of reacting with other compounds, namely ammonia, as taught by the leading references, is fatal to Davis' case