**In re Robert W. FENN, III, Emory J. Pless, Richard L. Harris, and Kevin J. O'Leary.**

**Appeal No. 80–583.**

United States Court of Customs and Patent Appeals.

Jan. 8, 1981.

William A. Skinner, Painesville, Ohio, and John W. Schneller, Washington, D. C., with whom Keil and Witherspoon, Washington, D. C., was on brief, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents and Trademarks; Henry W. Tarring, II, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This appeal is from a decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") which affirmed the examiner's rejection of claims 1–12, 14–15, and 20 under 35 U.S.C. § 103 as obvious from the teachings of Leduc et al.[1] ("Leduc"), Grossteinbeck et al.[2] ("Grossteinbeck"), Heidweiller,[3] and Francis.[4] We reverse.

## BACKGROUND

### Invention

The claims are drawn to a method of making a stable diaphragm for a chlor-alkali electrolytic cell cathode. The resulting diaphragm contains both fibrous asbestos and a thermoplastic fluorine-containing polymer in the form of a discontinuous fused coating on the asbestos. Avoidance of diaphragm swelling during subsequent cell operation is alleged to be an unexpected result of the claimed method. Claim 1 is illustrative:

1. A method of providing a hydraulically permeable dimensionally stable diaphragm on a foraminous chlor-alkali electrolytic cell cathode, which method comprises:

1. U.S. Patent No. 3,723,264 filed April 28, 1969, and issued March 27, 1973.

2. U.S. Patent No. 3,200,033, issued August 10, 1965.

3. U.S. Patent No. 3,622,445, issued November 23, 1971.

4. U.S. Patent No. 2,526,125, issued October 17, 1950.

(a) forming a slurry of fibrous asbestos and a particulate thermoplastic fluorine-containing polymer mechanically and chemically resistant to the cell environment by mixing together said asbestos and polymer, said polymer being present in an amount sufficient to prevent substantial swelling of the diaphragm;

(b) inserting the cathode to be coated into said slurry and depositing a uniform mixture of asbestos fibers and particulate polymer thereon by means of a vacuum;

(c) removing the coated cathode from the slurry and subjecting same to a temperature sufficient to allow the polymer to fuse and flow, without the application of pressure, and cause the polymer to bind adjacent fibers together without forming a continuous polymer coating on the fiber surface; and

(d) cooling the diaphragm coated cathode to substantially room temperature whereby there is obtained a diaphragm, dimensionally stable under operating cell conditions, characterized by asbestos fibers bearing a discontinuous fused polymer coating thereon.

## Prior Art

Leduc describes an electrolytic cell asbestos diaphragm having a binder composed of at least one of a group of polymers, including polytetrafluoroethylene. A Fourdrinier paper making machine is used to vacuum form an asbestos diaphragm sheet while applying heat and pressure which are in the ranges of 90°F to about 250°F and 15 p.s. i.g. to about 50 p.s.i.g. respectively. Leduc states that "[u]nder these conditions the asbestos fibers are linked with binder molecules or binder molecules are glued to the asbestos fibers in a substantially reinforced composition which, depending on the amount and type of binder and the duration of the heat treatment, may be a tightly bound or loosely linked web-like structure." Leduc also states that the "higher temperatures within the above range are employed in the drying step when non-rubbery binders are used and the binder has low affinity for the asbestos fibers. In this case higher temperatures are employed to soften the polymer particles and cause adhesion between the asbestos fibers and the binder. The higher temperatures of drying, however, are usually unnecessary unless the surface finish of the diaphragm is a factor for consideration or when a more rigid diaphragm is desired."

Heidweiller discloses a method of forming glass-fiber mats having low weight and superior strength by mixing glass fibers with polymer binder fibers and heating to cause the binder to adhere to the glass. In his example 1, the mat was dried at a temperature of 150°C, and "[d]uring the heating the binder is dissolved in the water that is still present, moves to the points where the fibers are in contact with each other, and causes the fibers to adhere together upon further drying. Finally the product was heated at 160°C for 2 further minutes to fully condense the ureaformaldehyde resin."

Grossteinbeck describes a method of preparation of paper and nonwoven fabric sheets. Synthetic fibers are mixed with a polymeric material and heated, the melted polymeric material collecting at and binding the fibers together at crossing points of the fibers.

Francis discloses a method of making paper products by mixing paper and synthetic resin to form a suspension which is then passed through calendar rolls under pressure and heat to render the resin fiber tacky and finally is cooled to effect fiber cohesion.

## Declarations

On May 31, 1977, Fenn submitted a declaration (Fenn I) concerning comparative tests conducted on diaphragms prepared by the Leduc process and a diaphragm allegedly prepared according to the claimed process. The results and observations are set forth in the following table.

| DIAPHRAGM | TYPE | HEAT TREATMENT | FLOW RATE (cc/min/in$^2$) | ANOLYTE HEAD (inches) | VOLTAGE (Milli-volts) | OBSERVATIONS |
|---|---|---|---|---|---|---|
| A | Conventional unmodified asbestos | None | 0.24 @ 24 hr. 0.18 @ 168 hr. | 4.5 3.0 | 3070 3250 | Swollen 100% after 2 hours operation. |
| B | Asbestos + PTFE '264 patent process | 8 psi, 200°F, 25 min. Dried 240°F, 15 min. | 0.60 @ 3 hr. 2.84 @ 54 hr. | 3.0 1.0 | 2780 2990 | Swollen; Extremely thin for chlor-alkali use. Ruptured after 54 hr. |
| C | Asbestos + PTFE '264 patent process | Dried 240°F, 15 min. | 0.29 @ 3 hr. 0.72 @ 99 hr. | 3.0 1.0 | 2870 2980 | Swollen; Extremely thin and fragile for chlor-alkali use. |
| D | Asbestos + PTFE fiber '264 patent process | 8 psi, 200°F, 25 min. Dried 240°F, 15 min. | 0.11 @ 2 hr. 0.17 @ 24 hr. | 3.0 3.0 | 3200 3500 | Diaphragm swollen by several hundred percent in 24 hours. |
| E | Asbestos + PTFE fiber '264 patent process | Dried 240°F, 15 min. | 0.21 @ 2 hr. 0.31 @ 24 hr. | 3.0 3.0 | 3490 3480 | Diaphragm 100% swollen in 2 hours, approaching anode in 24 hours. |
| F | Asbestos + PTFE fiber S.N. 324,508 process | Dried 203°F, 60 min. Fused 698°F, 60 min. | 0.18 (Initial and constant) | 3.0 | 3000 | No visible swelling for period > 30 days. |

On November 22, 1977, Fenn submitted another declaration (Fenn II) which includes a "Technical Data Sheet" and a brochure relating to modified diaphragm cells used by Diamond Shamrock Corporation (appellants' assignee) and many of its licensees. The "Technical Data Sheet" sets forth a comparison of results obtained by utilizing (a) conventional asbestos diaphragms, (b) polymer modified diaphragms made by appellants' invention, and (c) polymer modified diaphragms made by appellants' invention and used in conjunction with expandable anodes. The results indicated a savings of 145 kilowatt hours per short ton of chlorine over the conventional asbestos diaphragm. The brochure shows that a reduction in voltage on the order of 13% is achieved with the polymer modified diaphragm cell compared with the standard or conventional asbestos diaphragm cell.

### The Board

The board declared that "appellants' only argument with respect to the combination of references was that the secondary references are directed to nonanalogous arts"; that in view of a number of similarities between appellants' method of making asbestos diaphragms and prior art processes for making paper, the references to Grossteinbeck, Heidweiller, and Francis are clearly directed to analogous art; and (in its decision of April 7, 1980, on request for reconsideration) that the Fenn declarations relate to Leduc alone and are, therefore, "insufficient to overcome a *prima facie* case for obviousness in light of the combination of references."

### OPINION

■ The dispositive issue is whether, assuming that the Government has established a *prima facie* case of obviousness, this has been rebutted by appellants. With respect to the test data provided with the Fenn I declaration, we note that preparation of appellants' diaphragm is stated to have included the following:

The slurry was thoroughly agitated, 477 cc was poured into a Buchner funnel, and a vacuum was applied. The resulting

sheet was dried ... fused ... [and] ... *was placed in contact with the cathode* of a filter-press type, laboratory scale chlor-akali cell .... [Emphasis added.]

In contrast, step (b) *of the claims* requires "inserting the cathode to be coated into said slurry and depositing a uniform mixture of asbestos fibers and particulate polymer thereon by means of a vacuum." Accordingly, we agree with the Solicitor that no meaningful conclusions can be drawn from Fenn I (alone), because appellants simply did not test a diaphragm prepared according to *their claimed method*. Although it is well settled that comparative test data showing an unexpected result will rebut a *prima facie* case of obviousness, the comparative testing must be between the claimed invention and the closest prior art. *In re Merchant*, 575 F.2d 865, 869, 197 USPQ 785, 788 (Cust. & Pat.App.1978). On the other hand, the Technical Data Sheet included with the Fenn II declaration compares conventional asbestos diaphragms with polymer-modified diaphragms made by appellants' method; but there is no comparison with the closest prior art diaphragms, *i.e.*, those made in accordance with the Leduc process. Therefore, the Technical Data Sheet, taken alone, fails to rebut the Government's prima facie case of obviousness. Appellants argue that the Fenn II brochure demonstrates commercial acceptance of the diaphragm prepared by their claimed method. However, it is noteworthy that the brochure indicates that the diaphragms in the cells allegedly receiving commercial acceptance possessed at least six features not present in the diaphragm prepared by appellants' method; moreover, the cells were marketed with the availability of various engineering services. Therefore, a clear nexus between the claimed method and the alleged commercial success has not been established, and the Fenn II brochure fails to rebut the Government's *prima facie* case.

Finally, appellants argue that an indirect comparison may be made between the swelling characteristics of the diaphragm prepared according to their specification (Example 1) and the swelling characteristics of the closest prior art diaphragms (prepared by the Leduc process) shown in Fenn I. This has merit. In *In re Fouche*, 58 CCPA 1086, 1091–92, 439 F.2d 1237, 1241, 169 USPQ 429, 433 (1971), this court held that an "indirect showing of unexpected superiority" will rebut a *prima facie* case of obviousness and, in *In re Blondel*, 499 F.2d 1311, 1317, 182 USPQ 293, 298 (Cust. & Pat.App.1974), the court approved use of an indirect comparison of data of record in which the data compared were set forth in two separate declarations. In this case, appellants' Example 1 diaphragm was made in accordance with the claimed method and was tested under conditions substantially identical to those present in testing the closest prior art diaphragms in Fenn I. The Example 1 diaphragm exhibited "substantially no swelling ... after 775 hours" of operation; whereas, the closest prior art diaphragms in Fenn I exhibited very substantial swelling (up to and in excess of 100%) in from two to twenty-four hours.

Accordingly, we hold that appellants have overcome any *prima facie* case established by the Government.

The decision of the board is reversed.

*REVERSED.*